# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| **In the Matter of the Search of**<br>*(Briefly Describe the property to be searched*<br>*or identify the person by name and address)*<br>Facebook accounts associated with IDs: deanndra.yazzie.5;<br>xavier.yazzie.90; brelynn.claw.3; deanna.heyde.7 and<br>jacqueline.wilson.7330763, stored at the premises operated,<br>maintained, or controlled by Facebook, Inc. | Case No. 21-4261mb |

## <u>AMENDED</u> ELECTRONICALLY ISSUED SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer of an attorney for the government requests the search of the following person or property located in the Northern District of California.
*(identify the person or describe the property to be searched and give its location):*

### As described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

### As set forth in Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____September 15, 2021_____.
*(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10 p.m.
☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona</u>.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (*check the appropriate box*)
☐ for ___ days (*not to exceed 30*)     ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  _____

*Camille D. Bibles*
Digitally signed by Camille D. Bibles
Date: 2021.09.01 11:55:13 -07'00'

*Judge's signature*

City and State:  <u>Flagstaff, Arizona</u>     <u>Honorable Camille D. Bibles, U.S. Magistrate Judge</u>
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: 21-4261mb | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:_____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook user IDs, that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California: **deanndra.yazzie.5**, **xavier.yazzie.90**, **brelynn.claw.3**, **deanna.heyde.7**, and **jacqueline.wilson.7330763**.

## ATTACHMENT B-1

### Particular Things to be Seized for User IDs

### deanndra.yazzie.5, deanna.heyde.7, and jacqueline.wilson.7330763

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the **deanndra.yazzie.5**, **deanna.heyde.7**, and **jacqueline.wilson.7330763** user IDs identified in Attachment A:

(a)      All contact and personal identifying information including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **August 1, 2020 to December 7, 2020**;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **August 1,**

**2020 to December 7, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **August 1, 2020 to December 7, 2020**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

2

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **August 1, 2020 to December 7, 2020**;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of Felony Murder, in violation of 18 U.S.C. §§ 1153 and 1111; Second Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111; and/or Arson, in violation of 18 U.S.C. §§ 1153 and 81, involving DION JAMES ANAGAL, from **August 1, 2020 to December 7, 2020**, including, for the **deanndra.yazzie.5**, **deanna.heyde.7**, and **jacqueline.wilson.7330763** user IDs identified in Attachment A, information pertaining to the following matters:

(a) Communications, statements, audio, photographs, video, or any other media, files, or records, by any party, concerning the relationship or interactions between D.H. and ANAGAL; D.H. and ANAGAL's mental states, including mental health and substance abuse information; the December 6, 2020 house fire resulting in the death of D.H.; the motive, means, and opportunity to commit the house fire resulting in the death of D.H.; and preparatory steps taken prior to the house fire resulting in the death of D.H.;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

4

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT B-2**

**Particular Things to be Seized for User IDs xavier.yazzie.90 and brelynn.claw.3**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the **xavier.yazzie.90** and **brelynn.claw.3** user IDs identified in Attachment A:

(a)    All contact and personal identifying information including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **December 4, 2020 to December 7, 2020**;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **December 4, 2020 to December 7, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **December 4, 2020 to December 7, 2020**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

7

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **December 4, 2020 to December 7, 2020**;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

8

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of Felony Murder, in violation of 18 U.S.C. §§ 1153 and 1111; Second Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111; and/or Arson, in violation of 18 U.S.C. §§ 1153 and 81, involving DION JAMES ANAGAL, from **December 4, 2020 to December 7, 2020**, including, for the **xavier.yazzie.90** and **brelynn.claw.3** user IDs identified in Attachment A, information pertaining to the following matters:

(a) Communications, statements, audio, photographs, video, or any other media, files, or records, by any party, concerning the relationship or interactions between D.H. and ANAGAL; D.H. and ANAGAL's mental states, including mental health and substance abuse information; the December 6, 2020 house fire resulting in the death of D.H.; the motive, means, and opportunity to commit the house fire resulting in the death of D.H.; and preparatory steps taken prior to the house fire resulting in the death of D.H.;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

9

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

10

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly Describe the property to be searched<br>or identify the person by name and address)*<br>Facebook accounts associated with IDs: deanndra.yazzie.5;<br>xavier.yazzie.90; brelynn.claw.3; deanna.heyde.7 and<br>jacqueline.wilson.7330763, stored at the premises operated,<br>maintained, or controlled by Facebook, Inc. | Case No. 21-4261mb |

## AMENDED ELECTRONICALLY SUBMITTED APPLICATION
## AND AFFIDAVIT FOR A SEARCH WARRANT

I, Special Agent Stanley Arrington, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the Northern District of California:

### As described in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1111 & 1153 | CIR – Felony Murder |
| 18 U.S.C. §§ 1111 & 1153 | CIR – Second Degree Murder |
| 18 U.S.C. §§ 81 & 1153 | CIR – Arson |

The application is based on these facts:

### As set forth in Attachment C, incorporated herein by reference.

☒ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA *s/Jillian Besancon*

____X____ Sworn by Telephone

Date and time issued: _____

City and State: Flagstaff, Arizona

*Stanley Arrington*
*Applicant's Signature*

Stanley Arrington, Special Agent, FBI
*Applicant's printed name and title*

Camille D. Bibles
Digitally signed by Camille D. Bibles
Date: 2021.09.01 11:54:34 -07'00'

*Judge's signature*

Honorable Camille D. Bibles, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook user IDs, that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California: **deanndra.yazzie.5**, **xavier.yazzie.90**, **brelynn.claw.3**, **deanna.heyde.7**, and **jacqueline.wilson.7330763**.

## ATTACHMENT B-1

### Particular Things to be Seized for User IDs

### deanndra.yazzie.5, deanna.heyde.7, and jacqueline.wilson.7330763

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the **deanndra.yazzie.5**, **deanna.heyde.7**, and **jacqueline.wilson.7330763** user IDs identified in Attachment A:

(a)     All contact and personal identifying information including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **August 1, 2020 to December 7, 2020**;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **August 1,**

**2020 to December 7, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from **August 1, 2020 to December 7, 2020**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **August 1, 2020 to December 7, 2020**;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of Felony Murder, in violation of 18 U.S.C. §§ 1153 and 1111; Second Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111; and/or Arson, in violation of 18 U.S.C. §§ 1153 and 81, involving DION JAMES ANAGAL, from **August 1, 2020 to December 7, 2020**, including, for the **deanndra.yazzie.5**, **deanna.heyde.7**, and **jacqueline.wilson.7330763** user IDs identified in Attachment A, information pertaining to the following matters:

(a) Communications, statements, audio, photographs, video, or any other media, files, or records, by any party, concerning the relationship or interactions between D.H. and ANAGAL; D.H. and ANAGAL's mental states, including mental health and substance abuse information; the December 6, 2020 house fire resulting in the death of D.H.; the motive, means, and opportunity to commit the house fire resulting in the death of D.H.; and preparatory steps taken prior to the house fire resulting in the death of D.H.;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

4

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5

## ATTACHMENT B-2

**Particular Things to be Seized for User IDs xavier.yazzie.90 and brelynn.claw.3**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the **xavier.yazzie.90** and **brelynn.claw.3** user IDs identified in Attachment A:

(a)      All contact and personal identifying information including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **December 4, 2020 to December 7, 2020**;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **December 4, 2020 to December 7, 2020**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

6

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user from **December 4, 2020 to December 7, 2020**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

7

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from **December 4, 2020 to December 7, 2020**;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of Felony Murder, in violation of 18 U.S.C. §§ 1153 and 1111; Second Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111; and/or Arson, in violation of 18 U.S.C. §§ 1153 and 81, involving DION JAMES ANAGAL, from **December 4, 2020 to December 7, 2020**, including, for the **xavier.yazzie.90** and **brelynn.claw.3** user IDs identified in Attachment A, information pertaining to the following matters:

(a) Communications, statements, audio, photographs, video, or any other media, files, or records, by any party, concerning the relationship or interactions between D.H. and ANAGAL; D.H. and ANAGAL's mental states, including mental health and substance abuse information; the December 6, 2020 house fire resulting in the death of D.H.; the motive, means, and opportunity to commit the house fire resulting in the death of D.H.; and preparatory steps taken prior to the house fire resulting in the death of D.H.;

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

9

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

10

## <u>AMENDED ELECTRONICALLY SUBMITTED AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT</u>

I, Stanley Arrington, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.     I make this amended affidavit in support of an application for an amended search warrant for information associated with certain Facebook user IDs that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This amended affidavit is made in support of an application for an amended search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscribers or customers associated with the user IDs.

2.     Your Affiant is a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Your Affiant is a Special Agent (SA) of the Federal Bureau of Investigation (FBI), and is currently assigned to the Gallup, New Mexico, Resident Agency of the Phoenix, Arizona, FBI Field Division. Your Affiant has been employed as a Special Agent of the FBI since February 2015, and has received training at the Federal Bureau of Investigation Training Academy in Quantico, Virginia, the Indian Country Criminal Investigator Program in Artesia, New Mexico, as well as the Indian Country

Crime Scene Management training in Fredericksburg, Virginia, among other trainings. In the course of his official duties, your Affiant is charged with the investigation of crimes occurring on (among other places) the Navajo Nation Indian Reservation within the District of Arizona.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that DION JAMES ANAGAL (ANAGAL), an Indian and enrolled member of the Navajo Indian Tribe, committed criminal acts within the confines of the Navajo Nation Indian Reservation in the District of Arizona. Specifically, the facts and circumstances of this investigation establish probable cause to believe that on or about December 6, 2020, ANAGAL committed Felony Murder, in violation of 18 U.S.C. §§ 1153 and 1111; Second Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111; and Arson, in violation of 18 U.S.C. §§ 1153 and 81.[1]  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachments B-1 and B-2.

4.      The following information was developed by your Affiant and other Agents of the FBI and/or Criminal Investigators of the Navajo Department of Criminal Investigations (NDCI) Unit and/or Navajo Police Department (NPD), in connection with the joint FBI/NDCI investigation into the home arson and ultimate death of D.H. The statements contained in this affidavit are based in part on information provided to your

---

[1] On March 24, 2021, the grand jury returned an indictment charging ANAGAL with all of these offenses in case number CR-21-08017-PCT-DLR (MTM).

Affiant, either directly or indirectly through reports or affidavits, and information provided by witnesses. Your Affiant also relies on his experience, training, and background as a Special Agent with the FBI in evaluating this information, and on your Affiant's own work on this case. Because this affidavit is made for the purpose of demonstrating probable cause for the issuance of the search warrant, it does not purport to set forth all of your Affiant's knowledge of this investigation.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a "district court of the United States" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6.      On December 6, 2020, NPD dispatch received a call regarding a house fire at the Canyon de Chelly Housing #2 in Chinle, Arizona, which is located on the Navajo Nation Indian Reservation (Indian Country) within the District of Arizona. This residence was later identified to have been occupied by D.H., a 38-year-old female. NPD Officer D. Begay responded and made contact with a neighbor, A.T. A.T. informed NPD Officer Begay there was someone inside the home. The windows of the home were boarded up and Officer Begay removed a board from at least one window. NPD Officer Begay was unable to enter the residence due to the heat and size of the fire. When the fire was

eventually extinguished, investigators discovered the deceased body of D.H. inside the home.

**A. Interview of A.T.**

7.      On December 7, 2020, your Affiant interviewed A.T. in Chinle, Arizona. A.T. stated she had been living in a duplex-style home next to D.H. since Thanksgiving 2020. A.T. stated that on December 6, 2020, she could hear ANAGAL and D.H. arguing through the shared duplex wall. A.T. heard D.H. telling ANAGAL to leave because she was feeling sick.

8.      On the same date at an unknown time, A.T. was hanging clothes in her living room and began smelling smoke. A.T. did not have a fireplace in her side of the duplex and did not have a fire burning. A.T. walked outside and saw ashes on the ground near the front door of D.H.'s residence. ANAGAL was trying to put out a fire outside the house. A.T. saw D.H. through the open front door arguing with ANAGAL. ANAGAL was going in and out of the house. D.H. appeared to be okay at that time.

9.      A.T. went back inside her residence. Sometime later, A.T. went back outside and saw ANAGAL standing outside D.H.'s residence holding a hammer. A.T. looked toward D.H.'s residence and saw through the open front door that a fire was burning on the floor of D.H.'s residence.

10.     A.T. asked ANAGAL, "Where is she?" (meaning D.H.) and ANAGAL pointed toward the inside of D.H.'s residence. A.T. heard D.H. crying inside the burning house. A.T. stepped into the threshold of the burning residence and told D.H., "Girl,

come on, it's getting worse. Let's get the fuck out of here." D.H. told A.T. that it was too hot and she couldn't get out. A.T. was unable to get to D.H. because the fire was too hot and the smoke was too thick to see D.H.

11.     ANAGAL stood outside the residence and did not do anything to assist. A.T. saw ANAGAL go inside the residence once after the living room was on fire. A.T. stepped out of the residence and asked ANAGAL for help. ANAGAL just looked at A.T. without saying anything. ANAGAL did not appear to be worried or panicked about the fire.

12.     The windows of D.H.'s residence had been previously boarded up to prevent the home from getting cold. A.T. attempted to pull the wood from the window frame but was unsuccessful. A.T. yelled for someone to help, but no one did.

13.     A.T. returned to her side of the duplex followed by ANAGAL, who was still holding the hammer. ANAGAL hit the shared wall of the duplex one time. A.T. banged on the wall and could still hear D.H. screaming, but not as loud as earlier. A.T. pushed ANAGAL and told him to, "Snap out of it. Help me. She's inside, the fire is going."

14.     ANAGAL looked at A.T. and said, "Get those mother fuckers out." A.T. did not know who ANAGAL was referring to. A.T. told ANAGAL only D.H. was in the residence by herself. A.T. begged ANAGAL to help, but he didn't. ANAGAL told A.T. to get "them" out first, then he would help.

15.     A.T. thought ANAGAL was high on meth. A.T. pushed ANAGAL and asked for his help, but only once because ANAGAL was known to carry a "throw away," meaning a homemade firearm. ANAGAL walked away and did not display any concern or panic for the situation.

16.     After an NPD officer arrived, A.T. approached the officer to provide a statement. A.T. saw ANAGAL across the street at his father's house. ANAGAL began walking in the direction of A.T. and the officer with the hammer still in his hand. ANAGAL threw the hammer on the ground and the officer told ANAGAL to stand back and wait. ANAGAL cursed at and attempted to strike the officer.

**B.  Interview of John Doe**

17.     On December 8, 2020, your Affiant interviewed 16-year-old John Doe in Chinle, Arizona. John Doe is D.H.'s son, and he was on the phone with D.H. during the fire.

18.     John Doe stated that on December 6, 2020, he was with his father C.Y. and his grandmother. D.H. called John Doe on his cell phone and she sounded panicked. D.H. told John Doe, "Whatever happens to me, I just want to let you guys know that I love you" and also said, "I'm going to die." John Doe asked D.H. what was happening and D.H. stated that her ex-boyfriend ANAGAL was "setting her house on fire while she's inside." D.H. also stated that ANAGAL was "in front of the door, barricaded, and he has a hammer in his hand."

6

19.     John Doe heard an angry voice yelling and cursing. D.H. asked if he could hear the voice and stated that it was ANAGAL.

20.     John Doe told D.H. that she needed to fight to get out, but D.H. was stuck and couldn't get out. John Doe asked his mother if she was able to get out through the windows, but D.H. said they were blocked. (Affiant Note: According to A.T., the windows of D.H.'s residence were boarded up prior to this incident in an effort to keep the cold out.)

21.     John Doe overheard an unknown female's voice calling for D.H. and yelling for her to get out. D.H. was crying and told the unknown female that she was unable to get out because she was stuck. John Doe heard a loud noise and called his father C.Y. over to the phone before the phone call disconnected. John Doe attempted to call D.H. back, but he was unsuccessful.

22.     John Doe told C.Y. that D.H.'s house was on fire and that her ex-boyfriend was trying to kill her. John Doe called the NPD and was advised that a call was already received for the fire.

**C.  Interview of C.Y.**

23.     On December 8, 2020, your Affiant interviewed C.Y. in Chinle, Arizona. C.Y. had been legally married to D.H. since 2012. C.Y. stated that on December 6, 2020, C.Y. was with his mother and children in Albuquerque, New Mexico. At approximately 2:00 P.M. or 2:30 P.M., C.Y.'s son, John Doe, received a phone call. John Doe was

visibly upset and went outside and started hitting a wall. John Doe signaled for C.Y. to come outside and stated that D.H. was on the phone.

24.     John Doe handed the phone to C.Y., who heard D.H. breathing heavily. D.H. told C.Y. to "take care of my babies, watch out for my babies, uh just take care of them, let them know I love them with everything." C.Y. heard D.H. banging on what sounded like wood.

25.     C.Y. asked D.H. what was going on. D.H. stated she was trapped in her residence. According to C.Y., D.H. said ANAGAL "barricaded her in her house and he lit it on fire, and she was trying to get out." D.H. was crying, screaming, and trying to get out. D.H. pleaded for C.Y. to take care of her children and the phone call was cut off. Attempts to re-contact D.H. were unsuccessful. D.H.'s phone went straight to voicemail.

### D.  Interview of DION JAMES ANAGAL

26.     ANAGAL was arrested by NPD on December 6, 2020.  During transport, ANAGAL asked Officer N. Begay, "Do you know how [D.H.] is doing?"  Officer N. Begay replied that he did not know, and ANAGAL questioned, "Why aren't you guys looking for her, she's the one who started the fire."

27.     On December 7, 2020, your Affiant interviewed ANAGAL, who was in custody at the NPD Chinle Police District Jail. ANAGAL was provided with form FD-395, "Advice of Rights." ANAGAL read the consent portion aloud, stated he understood, signed the form to waive his *Miranda* rights, and agreed to the interview.

28.     ANAGAL stated that he was in a dating relationship and lived with D.H. prior to the house fire. ANAGAL did not appear to know that D.H. died in the house fire and thought she was with his daughter.

29.     ANAGAL did not like when D.H.'s male friends came to her residence and had a problem with it. ANAGAL also got carried away with getting high and drinking. At times, ANAGAL mentally pictured himself being compared to other males that D.H. knew, which would make him angry. ANAGAL told D.H. he heard voices in his head. D.H. would get mad at him and tell ANAGAL he needed to listen to her, not the voices.

30.     On December 6, 2020, ANAGAL was getting high and using matches to light his meth pipe. He also drank approximately half of a pint of whiskey that day. D.H. was in her bedroom sleeping. D.H. woke up and got mad because the door was open and it was cold. ANAGAL and D.H. argued about the door being open. ANAGAL couldn't remember what was said but began having thoughts that D.H. was comparing him to other people.

31.     D.H. was angry with ANAGAL, and ANAGAL got angry with D.H. because he thought D.H. was comparing him to other men. The argument went "from that, to something really big, you know, serious." ANAGAL stated that he and D.H. only argued, and ANAGAL denied getting into a physical confrontation that day.

32.     Prior to the interior house fire, ANAGAL lit his clothes on fire outside D.H.'s residence. ANAGAL said he was high and not thinking straight when he did so. He got water to extinguish that fire.

9

33.     As ANAGAL got high, he flicked lit matches to the ground near where the fire stove was located. ANAGAL described the living room as being carpeted with lots of firewood and clothes scattered about, as well as five trash cans full of trash, and two additional bags of trash.

34.     ANAGAL stated that he was inside the residence, tossed a lit match to the ground, and went to the restroom. He passed D.H. in the hall and she was upset about the fire. When ANAGAL returned, he noticed a fire had started in the living room. ANAGAL stated the fire "took off really fast." The windows of the residence were broken, so wood had been placed over the window frames to keep the cold out. ANAGAL thought D.H. was either still inside the burning house or possibly ran outside or next door. ANAGAL and D.H. were the only ones in the home at the time of the fire.

35.     ANAGAL walked outside after the fire started because he thought people were going to beat him up. He believed someone was pushing wood outside of the house and remembered seeing the fire blocking the front door.

36.     The next-door neighbor (who your Affiant believes to be A.T.) came over and was yelling, "somebody help," or something similar. A.T. asked ANAGAL something to the effect of, "Why are you just standing there?" ANAGAL had thoughts that he was being compared to other people and was always wrong. ANAGAL thought to himself that other people should help D.H. because she was always comparing him to other people.

10

37.     ANAGAL was angry and recalled yelling and cursing but couldn't remember if he was cursing at D.H. ANAGAL thought D.H. and "they" were trying to put out the fire. He couldn't explain who "they" were because he was hearing different voices in his head. ANAGAL was thinking about D.H. cheating on him and he eventually walked across the road to his father's house to show him the fire.

38.     ANAGAL denied keeping D.H. in the house during the fire, but stated that people have looked at ANAGAL like he was holding D.H. hostage in the past because he would not leave D.H.'s house after she asked him to leave during an argument. ANAGAL didn't have anywhere else to go, so he would just stay. ANAGAL denied being angry enough to force D.H. to stay in the house while it burned.

39.     After ANAGAL was advised that D.H. passed away in the house fire, ANAGAL stated that from the voices in his head, he believed she got out of the house through the back door that went into the adjacent home, or through the back window.

40.     Your Affiant told ANAGAL it was suspected that ANAGAL would not let D.H. leave the house. ANAGAL stated he did not hold D.H. captive and never threatened her, and that he is willing to go to trial so the public will know what happened.

**E.  Interview of R.A.**

41.     On December 7, 2020, your Affiant interviewed R.A. in Chinle, Arizona. R.A. is ANAGAL's father.

42.     R.A. believed ANAGAL moved into D.H.'s residence in August or September 2020. Prior to moving in with D.H., ANAGAL lived at R.A.'s house. R.A. did

11

not think ANAGAL drank alcohol but believed ANAGAL smoked, which caused problems to his mind.

**F. Interview of D.Y.**

43.    On December 8, 2020, your Affiant interviewed D.Y. in Chinle, Arizona. D.Y. is D.H.'s daughter. D.Y. provided her Facebook screenname as the same as her name. Furthermore, D.Y.'s Facebook User ID was found to be **deanndra.yazzie.5**. This was verified from public postings of photographs that appeared to be D.Y. Additionally, there was a public Facebook post from December 7, 2020 indicating D.Y. lost her mother.

44.    D.Y. stated that on August 16, 2020 at approximately 2:26 P.M., D.H. sent D.Y. a video through Facebook Messenger showing disarray in her home but did not say who caused the disorder.

45.    D.Y. stated that on or about November 6, 2020, D.Y. was going to visit with D.H., but couldn't because ANAGAL punched D.H. and broke her door down. On or about November 7, 2020, at approximately 5:43 P.M., D.H. sent D.Y. a video through Facebook Messenger showing D.H.'s residence and the disarray caused by ANAGAL. D.H. told D.Y. that ANAGAL caused the disarray in her house because ANAGAL heard D.H. was leaving.

### G. Interview of X.Y.

46.     On December 8, 2020, your Affiant interviewed X.Y. in Chinle, Arizona. X.Y. is the son of D.H. X.Y. provided his Facebook screenname as the same as his name. Furthermore, X.Y.'s Facebook User ID was found to be **xavier.yazzie.90.** During the interview of X.Y., he stated his Facebook profile picture was that of comedians "James and Ernie." You Affiant observed a Facebook profile picture that appeared to be what X.Y. described.

47.     X.Y. lived with D.H. and ANAGAL from approximately early June 2020 to September 2020 before moving to Phoenix, Arizona. X.Y. believed D.H. began dating ANAGAL sometime in June 2020.

48.     While living with D.H. and ANAGAL, X.Y. witnessed both D.H. and ANAGAL smoke some type of illegal substance out of a glass pipe, but was unsure what the substance was.

49.     X.Y. took care of D.H. because she had cancer and in while doing so, witnessed ANAGAL act verbally abusive towards D.H.

50.     The week before X.Y. left Chinle, Arizona, he witnessed ANAGAL return home with a military style duffel bag that contained .556 caliber rounds, 9 millimeter rounds, a drum magazine, M-14 style rifle, and pump action shotgun, with shotgun shells.

51.     Two nights before X.Y. left Chinle, Arizona, ANAGAL got into a fight with a gang in the area and often woke up in the middle of the night thinking someone was coming after him. At one point, ANAGAL woke up and handed X.Y. a firearm. X.Y.

told ANAGAL he did not want the weapon, but ANAGAL told X.Y. he had to do what was asked because X.Y. was living in ANAGAL's home. Around the same time, X.Y. witnessed ANAGAL punch D.H. in the face, twice. X.Y. recalled ANAGAL smelled like alcohol and meth at the time he punched D.H.

52.    On separate occasions, X.Y. returned from school and observed D.H. on the bed, holding her stomach, her legs were cut up, and hair was seen on the floor. X.Y. asked D.H. what occurred and D.H. said the cancer was causing her pain. X.Y. believed ANAGAL had attacked D.H.

53.    When X.Y. moved out of ANAGAL's home located in Chinle, Arizona, ANAGAL appeared happy and said "we" could finally do what "we" wanted and "run these streets." D.H. told ANAGAL that her kids needed her and when she got into the vehicle with X.Y., ANAGAL said, "fuck your kids, stay out here with me. I own you." After D.H. drove X.Y. to Phoenix, Arizona, she returned to Chinle, Arizona.

**H. Interview of C.T.**

54.    On December 15, 2020, your Affiant interviewed C.T. in Chinle, Arizona. C.T. was aware of arguments between ANAGAL and D.H. in the past, but they usually got over them (Affiant Note: C.T. lived next-door to D.H.). ANAGAL was attacked a few months ago and suffered a head injury. Since ANAGAL's head injury, he made statements that did not make sense; C.T. believed ANAGAL was "losing it." C.T. also believed ANAGAL knew he was having mental problems and D.H. tried to help. D.H. would get angry at ANAGAL about the hallucinations he was having.

14

55.     On December 6, 2020, C.T. stayed at his house most of the day and recalled seeing ANAGAL going in and out of D.H.'s home. C.T. also recalled seeing different people stop by D.H.'s home but were told to leave by ANAGAL.

56.     At approximately 2:00 p.m. on December 6, 2020, C.T. was awakened to someone screaming his name. At the time C.T. was awakened, he did not know who was screaming his name, but knew it was coming from near D.H.'s residence. When C.T. walked outside of his home, he saw D.H.'s home was on fire.

57.     C.T. attempted to enter D.H.'s home through the connecting duplex residence but was unsuccessful due to the inhalation of smoke. C.T. then went around to the back of D.H.'s residence and pulled a board from the window frame near the bedroom area and more smoke came out.

58.     When C.T. exited the connecting duplex residence, he asked ANAGAL what happened. ANAGAL was yelling and pointing towards the ceiling of D.H.'s burning residence saying something to the effect that he thought FBI Agents were in the ceiling area and the Agents weren't going to mess with him anymore. C.T. asked ANAGAL where D.H. was and ANAGAL pointed to the inside of the burning structure and said, "she's in there."

59.     When C.T. initially walked outside from his residence, he heard D.H. yell his name again and it sounded like she was in distress. After C.T. heard his name called for the second time, he knew it was coming from D.H. C.T. said that ANAGAL did not try to help during the house fire and walked across the street to his father's home.

15

**I.  Interview of N.C.**

60.    On January 13, 2021, your Affiant interviewed N.C. in Chinle, Arizona. N.C. is a relative of D.H. N.C. provided her Facebook screenname as a name with the initials N.C.(B.B). Furthermore, N.C.'s Facebook User ID was found to be **brelynn.claw.3**. This Facebook User ID was learned from visiting the publicly available Facebook page  N.C. provided.

61.    On December 6, 2020, D.H.'s son, X.Y., contacted N.C. via Facebook Messenger and asked N.C. to check on his mother because ANAGAL locked his mother in the house and set the house on fire.

62.    N.C. observed smoke coming from the area of D.H.'s residence, so she got into her vehicle and drove to D.H.'s residence. On the way to D.H.'s residence, N.C. contacted her sister-in-law, A.B., who said she was already at the scene of the house fire and the house was engulfed with fire.

63.    When N.C. arrived at D.H.'s residence, she approached two Navajo Police officers and advised them that D.H. was inside the burning residence.

64.    N.C. believed D.H. "went down-hill" after she met ANAGAL. Although N.C. never personally met ANAGAL, she learned about him from what D.H. said. N.C. described ANAGAL as someone that doesn't care and would "take a life without even, like, with no remorse." N.C. also said a lot of people feared ANAGAL and he was a violent person.

65.     N.C. was angry that D.H. was "shooting up" and that she needed to be with her children. N.C. was also aware that D.H.'s previous residence caught fire during the summer of 2020 but did not know who set the fire.

66.     All of N.C.'s communications on December 6, 2020 (at least during the house fire) were through Facebook. N.C. also used A.B.'s Facebook account to contact X.Y.[2] N.C. showed X.Y. and his father, C.Y., the house fire through a Facebook video call.

**J.  Other Investigation**

67.     While visiting N.C. (B.B.'s) Facebook page, your Affiant observed public Facebook posts from December 7, 2020, and December 8, 2020 indicating N.C. lost a friend whose screenname was Dill Pickles. Additionally, your Affiant observed public Facebook posts from N.C. (B.B.'s) Facebook page from December 8, 2020, December 10, 2020, and December 11, 2020, indicating N.C. lost a friend whose Facebook screenname was Dee Hey (Dill Pickles).

68.     Your Affiant was aware of D.H.'s appearance from previous interactions and identified multiple photographs in Dill Pickles' and Dee Hey (Dill Pickles)' public Facebook accounts that appeared to be D.H.

---

[2] This application does not seek authorization to search A.B.'s Facebook account.

17

69.     While viewing Dill Pickles' public Facebook page, the Facebook User ID was found to be **jacqueline.wilson.7330763.** While viewing Dee Hey (Dill Pickles)' public Facebook page, the Facebook User ID was found to be **deanna.heyde.7.**

70.     On February 15, 2021, the University of New Mexico School of Medicine, Office of the Medical Investigator, issued a report concerning the autopsy of D.H.'s remains.  The medical investigator opined that D.H.'s cause of death was thermal injuries and inhalation of products of combustion.  D.H. was alive when the fire started.  The manner of death was determined to be homicide.  Toxicology testing of the blood showed the presence of ethanol and methamphetamine.

71.     Your affiant obtained a Certificate of Navajo Indian Blood attesting that ANAGAL has 4/4 Navajo Indian Blood and is listed on the Navajo Indian Census Roll.

**K. Summary of Facebook Information**

72.     As discussed above, your Affiant has identified the following Facebook user IDs relevant to this investigation:

  a.  **deanndra.yazzie.5** is believed to be D.Y.'s user ID;

  b.  **xavier.yazzie.90** is believed to by X.Y.'s user ID;

  c.  **brelynn.claw.3** is believed to be N.C.'s user ID;

  d.  **deanna.heyde.7** and **jacqueline.wilson.7330763** are believed to be D.H.'s user IDs.

73.     The investigation in this case revealed that as early as August 2020, D.H. used Facebook to communicate with D.Y. about disarray to her home, including (in

18

November 2020) disarray caused by ANAGAL. Communications from this time period on D.H. and D.Y.'s Facebook accounts are likely to provide information about D.H.'s relationship with ANAGAL and ANAGAL's actions toward D.H. and her property in the months leading up to the fire.

74.    Further, X.Y. and N.C. both used Facebook to communicate about the December 6, 2020 house fire as it occurred.  These communications are likely to assist in establishing or verifying a timeline of events.

**L.  Background on Facebook**

75.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

76.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.   This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   Facebook also assigns a user identification number to each account.

77.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook

assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

78.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

79.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or

add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

80.    Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

81.    Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features,

and although Facebook does not record the calls themselves, it does keep records of the date of each call.

82.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

83.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

84.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

85.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

86.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

87.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.

22

When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

88.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

89.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

90.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and

23

prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the

Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

91.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

92.     On January 15, 2021, your Affiant submitted a preservation request to Facebook for the accounts **deanndra.yazzie.5, xavier.yazzie.90, and brelynn.claw.3**. According to Facebook's online law enforcement portal, these account preservations were set to expire on June 14, 2021.   On June 1, 2021, your Affiant extended the preservation request previously submitted to Facebook.   According to Facebook's online law enforcement portal, the account preservations expired on August 30, 2021.

93.     On June 4, 2021, your Affiant submitted a preservation request to Facebook for the **deanna.heyde.7** and **jacqueline.wilson.7330763** accounts. According to the Facebook's online law enforcement portal, these account preservations will expire on November 1, 2021.

94.     On August 27, 2021, Magistrate Judge Bibles issued a search warrant pertaining to the Facebook accounts listed in Attachment A.   *See* 21-4261mb.   The warrant was served on Facebook on August 27, 2021, prior to the expiration of the preservation requests.   On August 31, 2021, Facebook notified your Affiant that the

warrant was insufficient because it fails to state there is probable cause to believe that the records sought contain evidence of a crime.  In order to comply with the request for information, Facebook asked the government to provide an amended warrant that expressly states that the court has found probable case that the records sought contain evidence of a crime.  Accordingly, your Affiant submits this amended warrant application for the Court's consideration.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

95.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachments B-1 and B-2.  Upon receipt of the information described in Section I of Attachments B-1 and B-2, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 and B-2.

## CONCLUSION

96.    Based on the foregoing, I request that the Court issue the proposed amended search warrant.

97.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook,

who will then compile the requested records at a time convenient to it, reasonable cause

exists to permit the execution of the requested warrant at any time in the day or night.


Respectfully submitted,

*Stanley Arrington*
_____

Stanley Arrington
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me telephonically on _____, 2021.

Camille D.
Bibles

Digitally signed by
Camille D. Bibles
Date: 2021.09.01
11:53:59 -07'00'
_____

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge

27